# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT JACKSON
June 4, 2002 Session

## STATE OF TENNESSEE v. ERIC BERNARD CHISM

**Direct Appeal from the Circuit Court for Madison County**
**No. 00-446    Robert A. Page, Judge Sitting by Interchange**

---

**No. W2001-01287-CCA-R3-CD  - Filed November 8, 2002**

---

A Madison County jury convicted the defendant, Eric Bernard Chism, of first-degree murder, especially aggravated kidnapping, aggravated rape, and aggravated sexual battery in connection with the abduction and homicide of Beatrice Sue Westbrooks.  The defendant received an effective sentence of life plus 25 years.  On appeal, the defendant argues: (1) his right to a speedy trial was violated; (2) the trial court erroneously severed his case from that of his co-defendant; (3) the evidence is insufficient to support his convictions; (4) the trial court erroneously admitted unfairly prejudicial and inflammatory photographs; (5) the trial court improperly ruled that his prior narcotics conviction could be used for impeachment should he elect to testify; (6) a new trial should have been granted based on newly discovered evidence, but, at any rate, the hearing on the motion for new trial should have been continued until the results of additional forensic testing were available; and (7) the trial court erred in imposing consecutive sentencing.  After a thorough review of the record, we affirm the judgments and sentencing of the trial court.

### Tenn. R. App. P. 3; Judgments of the Circuit Court are Affirmed.

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JERRY L. SMITH, JJ., joined.

C. Mark Donahoe, Jackson, Tennessee (on appeal); and Scott G. Kirk, Jackson, Tennessee (at trial), for the Appellant, Eric Bernard Chism.

Paul G. Summers, Attorney General & Reporter; John H. Bledsoe, Assistant Attorney General; James G. Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On December 17, 1998, shortly before 4:00 p.m., the nude body of Beatrice Sue Westbrooks was found in a grassy area off of Algie Neely Road in Madison County. The police were summoned, and the assistant county coroner pronounced Ms. Westbrooks dead at the scene. The victim's identity was unknown at the time.

The following day, Dr. O.C. Smith, the Shelby County Medical Examiner, performed an autopsy and determined that the cause of death was multiple injuries. The victim had sustained four gunshot wounds to the head and upper body. There were crushing-type injuries involving the chest, abdomen, and extremities that were consistent with a vehicle having run over the body; the victim's upper arms, ribs, and pelvic girdle were fractured, and the crushing force applied to the abdominal area had split the flesh causing the intestines to extrude. The body also exhibited signs of strangulation and vaginal penetration. The injuries, Dr. Smith testified, were inflicted contemporaneously and while the victim was still alive. Dr. Smith was unable to provide an accurate estimate of the time of death.

To identify the victim, the Madison County Sheriff's Department solicited help from the public. A tip suggesting the victim's name led investigators to dental records from which Dr. Smith identified the victim as Ms. Westbrooks. Several weeks passed, but investigators made no further progress in the case. The defendant's involvement in the homicide, which was hotly contested at trial, was not suspected until March 28, 2000, at which time an eyewitness to the crimes identified the defendant and Calvin Lyons as the men who kidnapped and murdered Ms. Westbrooks.

In the light most favorable to the state, the evidence at trial showed the following. Madison County Sheriff's Department Lieutenant Donna Turner, the commander of the criminal investigation division, and Sergeant Tom Rudder, the lead investigator on the case, processed the homicide scene for evidence, and they testified at trial about what they observed and found and how they determined the woman's identity.

Sergeant Rudder testified that the crime remained unsolved until March 28, 2000, when Sergeant Rudder was contacted at his home by Sergeant Mark Reeves with the Jackson Police Department. The police department had someone in custody who wanted to talk about the Westbrooks homicide. The person, who was being held in connection with a stolen truck, was Melanie Black. She gave Sergeant Rudder a statement about the homicide and identified the defendant, whose street name was "Bernard," and Calvin Lyons, whose street name was "June," as the perpetrators. Sergeant Rudder testified that Ms. Black was able to supply details about the crime that could have been known only to someone who was present. The next day, March 29, the police located and arrested both men. The defendant and Lyons were charged with premeditated and felony murder, especially aggravated kidnapping, aggravated rape, and aggravated sexual battery.

At the time Westbrooks was murdered, Melanie Black was admittedly a prostitute and crack cocaine drug user. When she testified at trial, she also was a convicted felon serving a

three-year sentence for theft of a truck. Black knew the defendant and Lyons before Westbrooks' death. She had purchased crack cocaine from the men. Black testified that on December 17, 1998, she contacted "June" Lyons to meet her at Fuel Mart near Wilhite's Truck Stop to buy some crack cocaine. The defendant and Lyons arrived in a pickup truck, and the three left with Black sitting in the middle of the truck seat.

Black testified that at some point during the ride the defendant asked Lyons if the police were behind them. Black turned and in the truck bed "saw somebody's legs taped together in a blanket." She could not tell who the person was. The defendant ordered Lyons to blindfold Black and put her in the floorboard. Black testified that she did not know how long or to where they drove. When they stopped, they removed her blindfold. Black described the area as somewhere in the county off the road.

While Black remained in the truck, the defendant and Lyons removed the woman from the bed of the truck and took her to the front of the vehicle. Black did not recognize the victim. The woman was unclothed, and the men began hitting and kicking her. After a time, the men took Black out of the truck. They forced the victim to perform oral sex on Black. Black testified that the victim was upset and pleading with the men. Black said that she kept telling the victim that she was sorry. One of the men hit Black in the nose, and Lyons told her to get into the truck.

Black testified that once inside the truck, she saw the defendant grab the victim by the back of the hair and pull her to her knees. The defendant drew a gun from behind his back. Black described what followed: "And he shot her somewhere in – towards her head. I don't know exactly where. And I put my head down, and the gun went off two more times." Black testified that she did not see the other shots because she had her head in her hands, but she certainly heard them.

Black testified that, after the shots were fired, the men took turns raping her in the front seat of the truck. First, the defendant raped her while Lyons held a gun to her head. Black admitted that she did not fight, but she testified that she did not consent to the sex. Afterwards, the men again blindfolded Black and put her in the truck floorboard. They drove awhile, and Lyons told her to get up in the seat. Lyons undid the blindfold, and the defendant stopped the truck and went into a store. When the defendant returned, the men drove Black to her apartment complex and let her out by the soft drink machine. Black testified that before driving off, the defendant told her that if she "ever said anything about this, what happened to [her] would be worse." The defendant also threatened her that she better pay him that night the money that she owed him for drugs.

Black testified that she "went to work" and earned the money. Later that night, she contacted Lyons and told him that she had the defendant's money. The defendant collected his money and sold Black more crack cocaine. Black explained that she did not report anything to the police because she was scared. After that night, Black admitted that she "worked for" the defendant and Lyons a few times. The men would take her places to serve as a prostitute, collect the money, and give her crack cocaine.

Black eventually left town. She testified that she became afraid "something was fixing to happen" to her. She and a male friend left the state in a stolen vehicle. They were arrested in the stolen vehicle in Ohio, and Black was transported to Tennessee. After her arrest, Black told the police about the homicide and about her own brutal treatment. When Black learned the victim's identity, Black realized that she had encountered the victim a "couple of times in passing," including once at a crack house on Gordon Street. Black accompanied Sergeant Rudder to various locations to try and identify where the events occurred, and she estimated the time of the events to have been between 1:00 and 2:00 in the afternoon, with the men leaving her at the apartment shortly after 3:00 p.m. Based upon Black's account of events, the defendant and Lyons were also separately charged with the aggravated kidnapping of Black and two counts of aggravated rape.

At trial, Black insisted that she had no agreement or "deal" in connection with her testimony. Predictably, the defense vigorously attacked her credibility. Regarding the stolen vehicle conviction, the defense elicited that Black originally pleaded guilty with an agreement for a three-year, community corrections sentence. Black testified that as part of the agreement she was also told that after successfully completing community corrections, the felony conviction would be expunged from her record. Within a couple of weeks of her community corrections placement, however, Black was arrested on drug charges. According to Black, when she appeared in court on the community corrections revocation warrant, she entered a "new plea" to a three-year incarcerative sentence, which she currently was serving.

On cross-examination, Black stated that when she called Lyons from Fuel Mart, she asked only for $60 worth of cocaine, although she had earned several hundred dollars from prostitution the previous evening. Black claimed that she had been smoking crack cocaine all morning before going to Fuel Mart to eat, talk with some truck drivers, and use the outside telephone. When the defendant and Lyons arrived, Black described their vehicle as an older model green and white pickup truck.[1]

The defense also covered several inconsistencies between Black's trial testimony and other statements she had given. For example, in her preliminary hearing testimony, Black said that when she "turned around to look, [she] saw a naked woman in the back of the truck." She did not mention a body wrapped in a blanket with legs taped together. Also, in her previous statements, Black maintained that she never got out of the truck, and she never mentioned the men forcing the victim to perform oral sex on her. At the preliminary hearing, Black admitted that after the Westbrooks slaying, she had consensual sex with the defendant on more than one occasion.

In addition to Black's eyewitness testimony, the state offered the testimony of Christopher Williams, who had pending charges for aggravated burglary and was incarcerated in the

---

[1]The defense elicited from Sergeant Rudder that the police were unable to connect the defendant with a truck matching the description provided by Black. The vehicle in the defendant's possession when he was arrested was a blue pickup truck, and Lyons owned a station wagon. Oddly, the police did locate a green and white truck, titled to a person whose last name was Chism, but the owner was not the defendant.

Madison County jail. Williams' prior criminal history included convictions for reckless endangerment, aggravated assault, failure to appear, and attempted second-degree murder. Williams testified that he first encountered the defendant in March 2000, when he and the defendant were assigned to the same cell block in the jail.

Williams and the defendant had many conversations. Williams testified that the defendant admitted that he was in jail for killing a girl, and the defendant bragged that "the detectives and everybody wouldn't be able to prove it because she wasn't nothing but a crack head and that the one witness that the state had was telling a lie to cover her own ass."

Williams testified that the defendant talked about some of the details of the crimes. Williams said that the defendant told him about driving into a field by a tree. Lyons held Black at gunpoint, and the defendant told Black, "[Y]ou see what happens when you don't pay, when you run off and don't do what you're supposed to do. Do you think we playing at this or do you think this is some kind of joke?" The defendant told Williams that at that point Lyons interrupted, told the defendant to do what he was supposed to do, and said, "We ain't got time to be out here messing around." Williams testified that the defendant said he then shot the victim. The defendant also related that Lyons next shot the victim and that the two men beat and kicked the victim in the crotch. Afterwards, the men drove Black to her apartment. According to Williams, the defendant never explained how he met the victim, but the defendant said that he met Black at a strip place and that Black "started turning tricks" for the defendant.

Williams explained that his motivation for testifying was twofold. First, he was trying to "lighten the load" regarding his own criminal charge. Second, Williams testified that the defendant's callous remarks about the victim being a "crack head whore" bothered him because Williams' sister took drugs and easily could have met a similar fate. On cross-examination, Williams admitted that Sergeant Rudder assured him that if he testified, the state would recommend an incarcerative sentence of eleven months and 29 days on his pending burglary charge.

At the conclusion of the state's case, the trial court ruled that if the defendant testified, his prior drug conviction could be used to impeach his credibility. The defendant declined to testify, and he did not offer any proof in defense.

The jury convicted the defendant of the offenses specific to Westbrooks: premeditated, first-degree murder, first-degree murder in the perpetration of an especially aggravated kidnapping, especially aggravated kidnapping, aggravated rape, and aggravated sexual battery.[2] On

---

[2] At the conclusion of the proof, the trial court discussed its intended jury instructions with the parties. Concerning possible lesser-included offenses, counsel for the defendant stated unequivocally that the defendant did not want the jury instructed on any lesser-included offenses. The defendant on appeal has not challenged the charge to the jury, and we perceive no infirmity therewith in light of the defendant's affirmative waiver of lesser-included offense instructions. *See State v. Elesa D. McDaniels*, No. E2000-02790-CCA-R3-CD, slip op. at 6-7 (Tenn. Crim. App., Knoxville, Nov. 1, 2001).

(continued...)

the remaining counts involving Black, the jury found the defendant not guilty. The trial court imposed an effective sentence of life plus 25 years. The defendant has timely appealed his convictions and sentencing.

## I. Speedy Trial Claim[3]

The defendant complains that his convictions are infirm because his right to a speedy trial was violated. From the record, we discern that the defendant was arrested in March 1999 in connection with the homicide of Ms. Westbrooks. Following a preliminary hearing, an indictment was returned on August 2, 1999, No. 99-526, charging premeditated and felony murder, two counts of aggravated sexual battery, and aggravated rape. On September 14, 1999, the defendant filed a motion demanding a speedy trial.

The record reflects that on January 11, 2000, the co-defendant, Calvin Lyons, filed a motion requesting that the January 24, 2000 trial date be continued to allow adequate time for trial preparation. A consent order was entered on January 13, 2000, continuing the case until February 15, 2000 for selection of a new trial date. The consent order was approved for entry in writing by all the parties, including the defendant.

In May 2000, the defendant filed several motions, including a motion to strike the offense of especially aggravated kidnapping, which was listed on the cover of the indictment but not charged as a separate count. That motion also sought to strike one of the two aggravated sexual battery charges as duplicative. The record does not contain a ruling on the motion, but on June 5, 2000, a superseding indictment was returned, No. 00-446, charging premeditated and felony murder, especially aggravated kidnapping, aggravated rape, and aggravated sexual battery. That same date, the defendant moved to consolidate indictment No. 99-526 with indictment No. 99-527 (the Melanie Black charges) and to dismiss both indictments on the ground that he had been denied a speedy trial.

On June 29, 2000, the defendant and Lyons moved to have their cases transferred by interchange to another division. The motion recited that despite the trial judge's "diligent efforts" to secure a trial date with a substitute judge, no trial date had been set. Evidently, the motion was granted, and on August 15, 2000, a substitute judge, sitting by interchange, entered an order denying the motion to dismiss based on denial of a speedy trial. In short order, the new trial judge also scheduled all motions for hearing on September 5, entered an order of *nolle prosequi* dismissing indictment No. 99-526 and permitting the state to proceed on superseding indictment No. 00-446, transferred all earlier pleadings to indictment No. 00-446, consolidated indictment No. 00-446 with indictment No. 99-527 (the Melanie Black charges), and scheduled a trial for September 26, 2000.

---

[2](...continued)

[3] Our discussion of the issues in this opinion is in a different order than presented in the parties' briefs.

Against this background, the defendant argues in rather conclusory fashion that his speedy trial rights were violated for which his convictions should be dismissed. We disagree.

By statute and by federal and state constitutional guarantees, an accused has the right to a speedy trial. *See* U.S. Const. amend. VI; Tenn. Const. art. 1, § 9; *see also* Tenn. Code Ann. § 40-14-101 (1997). "The right to a speedy trial attaches at the time of arrest or indictment, whichever comes first, and continues until the date of the trial." *State v. Vickers*, 985 S.W.2d 1, 5 (Tenn. Crim. App. 1997).

Four factors are considered and weighed in determining if the right to a speedy trial has been compromised. On appeal, the trial court's application of the four-part balancing test is reviewed for abuse of discretion. *State v. Jefferson*, 938 S.W.2d 1, 14 (Tenn. Crim. App. 1996). The factors are (1) the length of the delay, (2) the reason for the delay, (3) the assertion of the right to speedy trial, and (4) any prejudice to the defendant occasioned by the delay. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192 (1972); *State v. Bishop*, 493 S.W.2d 81, 83-85 (Tenn. 1973). Of these factors, the most important is prejudice, and the critical inquiry concerning prejudice "is the impairment of the ability to prepare a defense." *State v. Vance*, 888 S.W.2d 776, 778 (Tenn. Crim. App. 1994). To activate the four-part inquiry, the interval between accusation and trial must be "presumptively prejudicial." *Doggett v. United States*, 505 U.S. 647, 651-52, 112 S. Ct. 2686-2690 (1992). A delay approaching one year usually activates the inquiry. *See Vickers*, 985 S.W.2d at 5.

Regarding the length of delay factor, the defendant's trial in this case commenced on September 26, 2000. He was arrested at the end of March 1999; therefore, the delay between accusation and trial was approximately eighteen months. In *State v. Walton*, 673 S.W.2d 166 (Tenn. Crim. App. 1984), a two-year delay was held insufficient, without more, to presume prejudice, and more recently in *Vickers*, a delay of three years and nine months was held not to require dismissal for lack of a speedy trial. *Vickers*, 958 S.W.2d at 7.

Regarding the reason for delay factor, the defendant claims, without any citation to the record, that "the State was just not ready to go forward" on May 24, 2000 and that the trial court improperly continued the trial until September 26. It appears to us that there were multiple reasons for delay in this case.

Notwithstanding the defendant's September 14, 1999 demand for a speedy trial, when co-defendant Lyons sought a continuance in January 2000, the defendant acquiesced in the delay, which resulted in the trial being continued until May 24, 2000. As for the May to September period of delay, our review is hampered because the defense has not provided a transcript of the May 24, 2000 proceeding wherein the trial was rescheduled to begin September 26. The pleadings in the record suggest that the original trial judge was unavailable to preside, due to illness in his family, and that as of May 24 arrangements had not been finalized to secure a substitute trial judge. An additional reason appears in the state's written response to the defendant's new trial motion. The

state explains that because of a defect in the original indictment, additional time was required to obtain a superseding indictment. This explanation tracks the pleadings on appeal that show on June 5, 2000, a superseding indictment was returned.

The most frequently encountered reasons for delay are (1) intentional delay by the state to gain a tactical advantage or harass the defendant, (2) negligence, (3) delay necessary to effectively prosecute the case, and (4) delay caused by or acquiesced in by the defendant. *See State v. Wood*, 924 S.W.2d 342, 346-47 (Tenn. 1996). The first and second reasons weigh against the state with intentional delay carrying the greater weight. The third reason is essentially neutral, weighing neither in favor of nor against either party. The fourth reason weighs against the accused. In this case, we are persuaded that the third and fourth reasons for the delay are evident; therefore, this factor does not support a determination that the defendant was deprived of his right to a speedy trial.

Regarding the assertion of the right to a speedy trial, the defendant first invoked the right in September 1999, approximately six months after his arrest. Less than four months after demanding a speedy trial, however, the defendant acquiesced in a continuance requested by his co-defendant. Another demand for speedy trial was not forthcoming until June 2000. This factor favors the defendant, but it is entitled to slight weight.

The final consideration, the prejudice factor, does not avail the defendant. Typically, an accused will argue prejudice by citing factors such as the death of a key principal witness prior to trial or the clouded memory of witnesses because of the elapsed time. In this case, the defendant's only arguments are that had his case been tried earlier, his jail mate, Christopher Williams, would not have testified and that he and Lyons would have been jointly tried. This argument, in our opinion, is inadequate to make an affirmative showing that the delay impaired the defendant's ability to prepare a defense. In addition, we note that the jury acquitted the defendant of the offenses involving Black.

On balance, the defendant has failed to demonstrate that he was deprived of his right to speedy trial, and we affirm the trial court's denial of the motions to dismiss the prosecution on that basis.

## II. Severance of Defendants

Next, we take up the defendant's complaint that the trial court erroneously granted a severance of defendants.

The grant or denial of a motion for severance of defendants is a matter that rests within the sound discretion of the trial court, and this court will not disturb the trial court's ruling absent a clear abuse of that discretion. *State v. Burton*, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988). Tennessee Rule of Criminal Procedure 14 addresses severance of defendants and provides in pertinent part that the trial court

on motion of the State or on motion of the defendant other than under subdivision (c)(1), shall grant a severance of defendants if:

(i) before trial, it is deemed necessary to protect a defendant's right to a speedy trial or it is deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants; or

(ii) during trial, with consent of the defendant to be severed, it is deemed necessary to achieve a fair determination of the guilt or innocence of one or more defendants.

Tenn. R. Crim. P. 14(c)(2).

Most severance-of-defendants issues come before this court in the form of a complaint by a defendant that reversible error resulted from being jointly tried with a co-defendant. In this case, however, the defendant argues that he was unduly prejudiced because the trial court *granted* a severance of defendants.

The trial court in this case was confronted with a classic *Bruton* problem. *See Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620 (1968) (admission of co-defendant's confession that implicated defendant in joint trial constituted prejudicial error). The record reflects that on the morning of trial, the state filed a motion to sever defendants because it intended at trial to introduce statements that the defendant allegedly made while in pretrial custody to another inmate which inculpated both the defendant and Calvin Lyons. In response to the severance motion, Lyons argued that the trial court should either exclude the inmate's testimony or redact the portion of the statement that mentions Lyons' involvement in the offenses. The state countered, and the trial court agreed, that the prosecution could not fairly present its case if all references to Lyons were deleted. The references to Lyons, the state explained, supplied invaluable evidence that corroborated the testimony of the eyewitness, Melanie Black. The only objection to severance voiced by the defendant was that the state's motion was untimely.

On appeal, the defendant insists that he was prejudiced by the severance because it forced his attorney "to go forward without being properly prepared for trial on his own due to the joint defense preparation." Our review of the record reveals that after the trial court granted the severance, Lyons' counsel interrupted to request a few additional minutes before the jury was brought in to "prep" the defendant's attorney about areas of witness examination that the defendant's attorney had not been involved in developing. The defendant's attorney added a request for the trial court's "patience on that because we're at somewhat of a disadvantage until we can sit down and go over some notes and get some documents straightened out and stuff." The trial court stated that it would "work with" defense counsel, and the trial court suggested taking a long lunch break so the attorneys could confer. The defendant never objected to the trial court's proposal, and he requested neither additional time nor a continuance.

Preparing for trial can be a time-intensive undertaking. When the workload has been divided between or among counsel for co-defendants, we appreciate that an eleventh-hour severance of defendants could pose a considerable hardship for the defendant whose case proceeds as scheduled. In our opinion, the trial court in this case exhibited an appropriate sensitivity to that potential prejudice, and the defendant has neither alleged nor demonstrated any specific hardship from which we could conclude that the trial court abused its discretion. Accordingly, we affirm the trial court's decision to sever the defendant's and Lyons' cases.

### III. Sufficiency of the Evidence

The defendant insists that the evidence is insufficient to support his convictions. He claims that his acquittal on the charges involving Black is inconsistent with the guilty verdicts for the offenses related to Westbrooks. He also argues that the state's evidence is "suspect" as illustrated by the jury's rejection of Black's testimony about her own treatment at the hands of the defendant. The thrust of the defendant's sufficiency-of-the-evidence argument is that the evidence did not establish that he was a perpetrator of the crimes.

First, consistency in verdicts for multiple-count indictments is not required. *See, e.g., Wiggins v. State*, 498 S.W.2d 92, 93-94 (Tenn. 1973); *State v. Gennoe*, 851 S.W.2d 833, 836 (Tenn. Crim. App. 1992). Consequently, the jury's not guilty verdicts on the offenses concerning Black provide no basis to attack the legal sufficiency of the convicting evidence on the counts naming Westbrooks as the victim.

Second, the alleged "suspect" nature of the state's evidence is not an appropriate subject for our evidence sufficiency review. A jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the state and resolves all conflicts in favor of the theory of the state. *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn. 1978); *State v. Townsend*, 525 S.W.2d 842, 843 (Tenn. 1975). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn. 1978). Moreover, a verdict against the defendant removes the presumption of innocence and raises a presumption of guilt on appeal. *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973); *Anglin v. State*, 553 S.W.2d 616, 620 (Tenn. Crim. App. 1997). The defendant has the burden of overcoming this presumption. *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1997). Most significantly, when the sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of act could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13; *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 2782 (1979).

Applying these principles, it is obvious that the state introduced evidence that, when accepted and accredited by the jury, established that the defendant committed the offenses of first-degree murder, especially aggravated kidnapping, aggravated rape, and aggravated sexual battery. The defendant's argument about the state's "suspect" evidence is nothing more than an assault on

the credibility of Melanie Black. We cannot, under the circumstances, usurp the jury's responsibility and power to accept some, all, or none of a witness's account of events. The trial, not the appeal, is the threshing arena for winnowing out the chaff from the sometimes jumbled mass of evidence. Because the evidence is legally sufficient to support the verdicts, we reject the defendant's argument.

## IV. Admissibility of Photographs

The defendant claims that he is entitled to a new trial because the trial court permitted the state to introduce unfairly prejudicial and inflammatory photographs. Specifically, the defendant objects to eighteen photographs introduced as collective Exhibit 2; these photographs were taken at the crime scene, and most of them depict, from various angles and lighting conditions, the victim's body. The defendant also objects to four photographs introduced as collective Exhibit 3, which show the boot and tire impressions on the ground at the scene. These photographs do not show the victim's body. The last set of objected-to photographs are seventeen autopsy photographs introduced as collective Exhibit 6. The defendant argues in conclusory fashion that the photographs were unnecessary, cumulative of other evidence presented, and inflammatory. He offers no individualized argument pertaining to specific photographs.

We apply a familiar standard of review. In determining whether a photograph should be admitted, the trial court must determine, first, whether the photograph is relevant. Tenn. R. Evid. 401; *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). Photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used. *See Collins v. State*, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973). Photographs must be relevant to prove some part of the prosecution's case and must not be admitted solely to inflame the jury and prejudice them against the defendant. *Banks*, 564 S.W.2d at 951; *see* Tenn. R. Evid. 403 (relevant evidence may be admitted if its probative value is not "substantially outweighed by the danger of unfair prejudice"). On appeal, the trial court's decision to admit a photographic exhibit is reviewable for abuse of discretion. *Banks*, 564 S.W.2d at 949.

In our view, the trial court did not abuse its discretion with respect to the photographs.

First, we see no basis to question the admissibility of the boot and tire impression photographs. Second, as for the autopsy and crime-scene photographs, the record reflects that the trial court was appropriately sensitive to their shock value; indeed, the trial court excluded some of the photographs that the state sought to introduce and encouraged the state to eliminate as many pictures as possible.

Admittedly, the photographs in this case are gruesome. The victim, however, was subjected to a mind-numbing array of violent assaults. She was stripped naked, viciously kicked and beaten, shot multiple times, strangled, and crushed by a force – probably a vehicle – powerful enough to fracture her face, both arms, and four ribs and to split the skin along the abdomen causing her intestines to extrude. The victim had not been dead long when the photographs at the scene were taken, and the body had not started to decompose. Photographs of a corpse are "admissible in

murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *Banks*, 564 S.W.2d at 950-51.

In this case, the state had the burden with respect to the first count of the indictment to show beyond a reasonable doubt that the defendant committed premeditated, first-degree murder. The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. *State v. Rosa*, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999). The use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of his intent to kill the victim, evidence of a procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing may support the existence of premeditation. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). The trial court, in our opinion, did not abuse its discretion in determining that these photographs were probative of premeditation and that their probative value was not substantially outweighed by the danger of unfair prejudice.

As particularly regards the autopsy photographs, our review of the record also shows that during a jury-out hearing on the admissibility of those pictures, the defendant waived objection to all except one photograph of the victim's genital area. That photograph was relevant because the fourth count of the indictment charged aggravated rape, and the state had the burden of demonstrating that sexual penetration had occurred. The photograph, in conjunction with Dr. Smith's testimony and the testimony of Melanie Black, supported the state's theory that the defendant kicked the victim with sufficient force in the groin area to penetrate and injure the victim's genitals.

In conclusion, we hold that the trial court did not err in admitting the photographs in this case.

## V. Defendant's Prior Convictions

The defendant next contends that the trial court improperly ruled that his prior narcotics conviction could be used for impeachment should he testify. Following this ruling, the defendant did not take the stand.

Subject to certain conditions for admissibility, Tennessee Rule of Evidence 609 authorizes the use of proof of a witness's prior convictions in order to attack a witness's credibility. Tenn. R. Evid. 609(a). The prior conviction must be for a felony or a crime involving dishonesty or false statement. *Id*. 609(a)(2). To be eligible as an impeaching conviction, a prior felony conviction need not involve dishonesty. *Id.*

When the witness to be impeached is the criminal defendant, the state must give notice prior to trial of its intent to utilize the conviction for impeachment purposes, *id*. 609(a)(3), and upon request, the court must determine the admissibility of an eligible conviction by deciding whether "the conviction's probative value on credibility outweighs its unfair prejudicial effect on the

substantive issues," *id.* In making this determination, "two criteria are especially relevant." *State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999). First, the court must "analyze the relevance the impeaching conviction has to the issue of credibility" and "explain [the relevance] on the record," *id*., and second, it must, "assess the similarity between the crime on trial and the crime underlying the impeaching conviction," *id*. (quoting Neil Cohen et al., Tennessee Law of Evidence § 609.9, at 376 (3d ed.1995)).

On appellate review, the trial court's rulings on admissibility of prior convictions for impeachment purposes are subject to reversal only for abuse of discretion. *See Mixon*, 983 S.W.2d at 674.

The prior conviction at issue in this case was for possession of cocaine with intent to resell. The offense date was April 13, 1990, and the defendant was sentenced on February 25, 1992 to a term of eight years in confinement. This conviction fell well within the ten-year time period beyond which impeachment use of prior convictions becomes less favored. Prior felony drug convictions can qualify as being relevant and probative of an accused's credibility. *See State v. Dooley*, 29 S.W.3d 542, 554 (Tenn. Crim. App. 2000).

Regarding the similarity between the crimes on trial and the crime underlying the impeaching conviction, the trial court in this case took into account the defense argument that drug dealing was entwined with the offenses on trial, but it concluded that the offenses on trial were crimes of violence not similar to the drug involvement underlying the prior conviction. As for relevance to the issue of credibility, the trial court observed that drug convictions reflect on moral character and are not without probative value as to credibility. On balance, the trial court was convinced that the conviction's probative value on credibility outweighed any unfair prejudicial effect on the substantive issues in this case. We conclude the trial court acted within its discretion.

## VI.  Newly Discovered Evidence

After the jury found him guilty of the Westbrooks offenses, the defendant petitioned the trial court for a new trial. One of the grounds for seeking relief was newly discovered evidence. Specifically, the defendant claimed that after his trial, he encountered a jail inmate, Eric Logan, who was a cousin of state's witness Christopher Williams. The defendant submitted an affidavit by Logan to the effect that Logan and Williams had a conversation in July 2000 wherein Williams related that he had discovered a way to get out of jail by testifying against the defendant. The defendant also submitted an affidavit by Larry Willis who stated that Melanie Black had confided in him that she was directly involved in Westbrooks' murder and that in exchange for "money and dope" she had lured Westbrooks to a "pre-disclosed" location. Willis' affidavit did not name the other responsible parties. Last, in an amendment to his new trial motion, the defendant asserted that when the motion is heard he will present testimony from Elizabeth Estes who will say that Melanie Black solicited her to corroborate Black's testimony and "go along with this story."

The trial court conducted a hearing on the new trial motion. The defense presented no live testimony. Instead, the defendant relied on the affidavits of Logan and Willis, and the defendant represented to the court that Estes was eluding process and that more time would be needed to locate her. The trial court denied the motion for new trial. The defendant complains that his motion was heard prematurely and that it was erroneously denied.

In seeking a new trial based on newly discovered evidence, there must be a showing that the defendant and defense counsel exercised reasonable diligence in attempting to discover the evidence and that they did not know of the alleged newly discovered evidence prior to trial. *See State v. Nichols*, 877 S.W.2d 722, 737 (Tenn. 1994). Moreover, the materiality of the new evidence must be demonstrated, and the trial court must determine whether the result of the trial would likely have been changed if the evidence had been produced and accepted by the jury. *State v. Goswick*, 656 S.W.2d 355, 358-59 (Tenn. 1983). On appellate review, we will disturb the trial court's ruling on a motion for new trial based upon newly discovered evidence only if the lower court abused its discretion. *State v. Walker*, 910 S.W.2d 381, 395 (Tenn. 1995); *State v. Meade*, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996).

In the present case, the trial court found that the defendant had not met the burden required to receive a new trial on the basis of newly discovered evidence. The trial court stated that the impeaching evidence reflected in the affidavits submitted by the defendant would not have changed the outcome of the trial. We agree.

The Logan and Willis affidavits are not relevant to the substantive merits of the offenses. Neither affidavit exonerates the defendant. The materiality of the affidavits relates, if at all, to the credibility of Black and Williams as prosecution witnesses. Willis, for instance, in his affidavit does not name the men who allegedly enlisted Black's help. Black's alleged involvement does not exclude the defendant's participation in the offenses. The defendant claims that Black's participation makes her an accessory to the crimes, thereby requiring the state to corroborate her testimony. Even so, there is evidence in this record that suffices for that purpose. Williams' testimony corroborated Black's account of the events.

Logan's affidavit suggests that Williams had a motive to testify falsely against the defendant to gain early release from custody. Williams, however, admitted at trial that one of the reasons he agreed to testify was to "lighten the load" regarding his own criminal charge. In our view, Logan's affidavit was merely cumulative of testimony already elicited at trial that brought into question Williams' credibility.

We are not at all convinced of the likelihood of a different result had this evidence been produced and accepted by the jury. We further note that to justify the granting of a new trial on the basis of newly discovered impeachment evidence, "it must be shown that the testimony of the witness sought to be impeached was so important to the issue and the impeaching evidence was so strong and convincing that a different result at trial *must necessarily follow*." *State v. Arnold*, 719 S.W.2d 543, 550 (Tenn. Crim. App. 1986) (emphasis added). The evidence that the defendant

submitted in this case was not of such a character and, therefore, was not a sufficient basis for the grant of a new trial.

In connection with his pursuit of a new trial, the defendant is aggrieved that the trial court would not continue the hearing on his motion pending the results of a forensic comparison of hair samples collected from the victim's body with blood samples obtained from the victim, Black, Lyons, and the defendant. Evidently, during the autopsy of the victim's body, hair samples were retrieved but not submitted for testing. After the defendant was convicted, the state filed a motion to continue Lyons' trial to allow time for the evidence to be tested. A copy of the state's continuance motion was filed as an exhibit by the defendant at the hearing on his new trial motion. The trial court declined to continue the new trial hearing inasmuch as the hearing had been delayed twice before at the defendant's request. The trial court also observed that the defense had other avenues to raise the results of new scientific evidence should they prove helpful to the defendant.[4]

In his brief to this court, the defendant makes various factual assertions about the results of the tests and how the results affected the co-defendant's prosecution. We decline to accept or consider these unsupported assertions because counsel's appellate recitations of fact and arguments are not evidence. *See, e.g., State v. Burton*, 751 S.W.2d 440, 450 (Tenn. Crim. App. 1988). The result is that, on appeal, the defendant has failed to show that the trial court erred in denying a continuance of the hearing on the motion for new trial.

## VII. Consecutive Sentencing

The defendant's final complaint is that consecutive sentencing is excessive and unfairly punitive in his case. The trial court found that consecutive sentencing was warranted on the grounds that the defendant is a dangerous offender and that he was on probation at the time he committed the instant offenses. The trial court imposed 25-year sentences for the especially aggravated kidnapping and aggravated rape convictions and a twelve-year sentence for the aggravated sexual battery conviction; these sentences were ordered to be served concurrently to each other but consecutively to the life sentence for first-degree murder.

When there is a challenge to the length, range, or manner of service of a sentence, it is incumbent on this court to review the record *de novo* with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1997). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). "The burden of showing that the sentence is improper is upon the appellant." *Id.* In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence if purely *de novo*. *Id.* If appellate review, however, reflects that the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this

---

[4] *See* Post-Conviction DNA Analysis Act of 2001, Tenn. Code Ann. §§ 40-30-401 to -413 (Supp. 2001).

court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

When a defendant is convicted of multiple offenses, the trial court must determine if the sentences shall be served consecutively or concurrently. Tenn. Code Ann. § 40-35-115 (1997). Consecutive sentencing may be imposed in the discretion of the trial court upon a determination that the offender meets at least one of the following criteria:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist . . . ;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor . . . ;
>
> (6) The defendant is sentenced for an offense committed while on probation; or
>
> (7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b)(1)-(7) (1997). In addition to these criteria, consecutive sentencing is subject to the general sentencing principles providing that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." *Id*. §§ 40-35-102(1), -103(2) (1997); *see State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). Moreover, in *State v. Wilkerson*, 905 S.W.2d 933, 937-38 (Tenn. 1995), the supreme court articulated two additional requirements for consecutive sentencing under the dangerous offender category; the trial court must find consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. *See Imfeld*, 70 S.W.3d at 708 (need for the additional *Wilkerson* findings arises in part because "dangerous offender" category "is the most subjective and hardest to apply").

No evidence was presented at the defendant's sentencing hearing, and neither the state nor the defendant registered any objections to the presentence investigation report. At the hearing,

the defendant conceded that he committed the instant offenses while on probation for a previous felony offense. As for the defendant's status as a "dangerous offender," the trial court made particularized findings. The trial court catalogued the brutal injuries to the victim, which demonstrated that the defendant had no regard for human life and no hesitation about committing a crime when the risk to human life was high. The trial court stated, "These are some of the most atrocious, cruel offenses I've seen since I've been sitting in this position," from which the trial court concluded that consecutive sentencing was necessary to protect the public and reasonably related to the severity of the offenses.

In our opinion, the record and the defendant's concession of his probationary status at the time of the Westbrooks offenses provide ample support for the imposition of consecutive sentencing, and we affirm the trial court's rulings.

Accordingly, and for the reasons set forth above, we affirm the judgments and sentencing of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE